**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--- --------------------------------------------------------X

|                                    | 13 Civ. 6009 (KPF) |

                                          Debtor.
----------------------------------------------------------

JOSHUA SIMON MARGULIES,

       Appellant,

  v.

DENNIS HOUGH and USAA CASUALTY
INSURANCE COMPANY,

       Appellees.

----------------------------------------------------------

DENNIS HOUGH,

       Cross-
       Appellant,

  v.

JOSHUA SIMON MARGULIES and USAA
CASUALTY INSURANCE COMPANY,

       Cross-
       Appellees.

--------------------------------------------------------X

### APPELLANT'S OPENING BRIEF

#### ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

**JURISDICTIONAL STATEMENT**...................................................**3**

**STATEMENT OF THE ISSUES**.....................................................**3**

**STATEMENT OF THE CASE**........................................................**4**

**STATEMENT OF THE FACTS**......................................................**5**

**STANDARD OF REVIEW**............................................................**14**

**ARGUMENT**...............................................................................**14**

**CONCLUSION**............................................................................**34**

## JURISDICTIONAL STATEMENT

This matter is subject to this Court's jurisdiction pursuant to 28 U.S.C. § 158(a)(1). Margulies takes his appeal from the Final Document Closing Adversary Proceeding ("Final Judgment and Order"), which is a final order, judgment or decree.  The Final Judgment and Order was signed on May 29 2013, and entered on the docket of the Bankruptcy Court on May 29, 2013.  Margulies's Notice of Appeal was filed on June 11, 2013, within the fourteen (14) day period provided by Fed. R. Bank. P. 8002(a).

## STATEMENT OF THE ISSUES

1. Whether the Bankruptcy Court erred in finding that Margulies's conduct was "willful" within the meaning of Bankruptcy Code § 523(a)(6).

2. Whether the Bankruptcy Court erred in finding that Margulies's conduct was "malicious" within the meaning of Bankruptcy Code § 523(a)(6).

3. Whether the Bankruptcy Court erred in finding that Margulies's debt to Hough is excepted from discharge under Bankruptcy Code § 523(a)(6).

4. Whether the Bankruptcy Court erred in finding that the definitions if "willful and malicious" under Bankruptcy Code § 523(a)(6) and "intentional" under New York State law relating to insurance exclusions are identical.

5. Whether the Bankruptcy Court erred in finding that Margulies's conduct constituted "an intentional act" within the exclusions of Margulies's insurance policies with USAA.

6. Whether the Bankruptcy Court erred in dismissing Hough's coverage claim against USAA.

## STATEMENT OF THE CASE

On  July 26 2010 Margulies filed a Voluntary Petition (Chapter 7), and listed as his largest debt a default judgment of more than $3 million, owed to Hough as a result of an August 3, 2000 accident ("the Accident") in which Margulies's car struck pedestrian Hough. Hough brought an Adversary Proceeding against Margulies and his insurance company, USAA Casualty Insurance Company ("USAA"). Hough argued that either (1) Margulies's actions in connection with the Accident had been "unintentional," as defined in New York State Insurance Law governing insurance exclusions – in which case Hough, standing in Margulies's shoes, should be allowed to collect against USAA to the limits of Margulies's auto policy and umbrella policy;

or (2) Margulies's actions were "willful and malicious" as defined by 11 U.S.C. § 523(a)(6) – in which case Margulies's debt to Hough should be excepted from discharge.

The Bankruptcy Court held a hearing on December 14, 2012. On May 16, 2013, the Court issued its Written Decision, in which it found Margulies's actions during the August 3, 2000 accident to have been "willful and malicious." Accordingly, Margulies's debt to Hough was excepted from his bankruptcy discharge, and USAA would not be required to indemnify Margulies.

## STATEMENT OF THE FACTS

On August 3, 2000, Joshua Simon Margulies ("Margulies") and Kristopher Zdyb ("Zdyb") were partners in an Internet start-up they had cofounded. (T157-158). The men had been friends since early childhood (T157), and ran the business from Zdyb's one-bedroom apartment in New York's Chinatown. (T 158),[1] (Deposition of Margulies, page 12, lines 16-19).

Margulies had earned a Bachelor's Degree from Columbia University, a Master's in Public Administration from the Maxwell School of Citizenship and Public Affairs, and a J.D. from the Syracuse University School of Law. (T 201).

---

[1] Citing to transcript

Zdyb had earned his Bachelor's Degree from the University of Rochester, and his Master of Business Administration from Northwestern University's Kellogg School of Management. (T156).

Together, they had formed "LawyerAccess," an online lawyer-client referral service. (T157). They had succeeded in raising their initial investment pool. (T157-158). They had secured the first "approval" the American Bar Association had ever given to an online attorney referral system. (T157-158). And, on August 3, they were scheduled to meet with former New York State Governor Mario Cuomo (T204), whose support and endorsement they thought to be of critical importance to their company's further success. (T158-159).

The meeting with Governor Cuomo was scheduled to begin at 11:00 am in his midtown Manhattan law offices at the firm of Weil, Gotshal & Manges LLP ("Weil Gotshal."). (T204). Margulies and Zdyb got in a Ford Taurus (the "Car") owned by Margulies (T 202)[2], to make their way uptown. Margulies drove the car. Zdyb sat in the front seat, on the passenger's side. (T204).

Margulies drove them north on Sixth Avenue ("Sixth Avenue" or "Avenue of the Americas") (T 204), which at the time was a one-way, northbound, six-lane

---

[2]  Parenthetical citations to "T ͜  ͜ " are to the cited page numbers of the Trial Transcript.

roadway (T 34). One of the lanes was closed (T35), making traffic unusually heavy. (T205).

Margulies and Zdyb continued to move slowly uptown, and, when they neared the intersection of 23rd Street, they saw that the slowdown on 6th Avenue was being caused by construction activity inside a fenced-in lot on the east side of 6th Avenue. (T204-205). The lot was bordered on the south by 22nd Street and on the north by 23rd(T205). Midway between 22nd and 23rd Streets, there was an opening in the fence. (T209).

Dennis Hough ("Hough") was a construction laborer employed by Civetta Cousins ("Civetta Cousins") (T30), the construction company performing work on the site. (T31).

Hough would periodically step into Sixth Avenue and raise a flag with his hand, causing traffic to stop, while large trucks exited and entered the construction site. (T37-40) Neither Margulies nor Zdyb had ever met Hough prior to that day. (T39, T221).

As Margulies's car passed the intersection of 22nd Street and Sixth Avenue, Margulies and Zdyb saw Hough step into the street and wave a flag, in a gesture they believed meant to signal traffic to stop. (T208).

Margulies complied immediately, and brought his car to a stop a few feet in front of Hough. (T208). From where Margulies's car was positioned, on Sixth Avenue, midway between 22nd and 23rd Streets, Margulies and Zdyb could see into the opening of the construction lot. (T209). They observed no activity which explained the halting of traffic on Sixth Avenue. (T161, T209)

Margulies and Zdyb saw the red light at 23rd Street and 6th Avenue turn green for drivers on Sixth Avenue, and then watched as it turned yellow and then back to red. (T209). Margulies saw that traffic in the lane to his immediate left would sometimes proceed and only sometimes stop for Hough's signal. He saw that the lane further west had never stopped at all. (T2011). Zdyb later testified that "traffic on our left actually zipped around him [Hough] in standard New York City fashion." (T161).

Margulies and Hough met eyes, and Margulies pantomimed to the best of his ability his need to continue along Sixth Avenue; he pointed to his watch and to the empty road north of the construction site. Hough looked away, and stepped east, out of the path of Margulies's car. (T43, T45-46, 130-131, 209-213, 212-13, 231-34).

The light at the 23rd Street intersection turned green again. Margulies kept his car at a stop, but, when he saw the light at 23rd Street turn yellow again, he attempted to alert Hough to the fact that Margulies intended to proceed when the

light next went green. Margulies revved his engine for a moment (T132, 213-14, 234, 246-47, 250). And he believed Hough, who had heard the engine rev (T49), had understood that Margulies would proceed momentarily. (T213).

Indeed, when the light at 23rd Street next turned green, Margulies began to release his foot from the brake, and to allow his car to begin to move forward at a speed slower than that of walking. (T167-168, T215-217).

Instead of staying where he was, Hough backed into the path of Margulies's moving car. (T217) This took Margulies by surprise. (Deposition of Margulies, pages 69, lines 20-24).

Margulies began to turn his car to the left, so as to avoid Hough, but the traffic in those lanes had already begun moving at a fast pace. To avoid being hit by that traffic, Margulies turned back to the right (T217; Deposition of Margulies, pages 70, line 15 – page 72, line 5; page 74, lines 3-9), and his car made contact with Hough, who "rolled or hopped" over the edge of the front bumper on the passenger's side of Margulies's car. (T218; Deposition of Margulies, pages 70, lines 11-14). Hough stumbled and fell[3], then jumped back to his feet, threw his flag at Margulies's car, and gave him the finger. (T177 & 219, 220).

---

[3] At trial, Zdyb testified that Hough stumbled, but did not fall. Hough was on the side of the car closest to Zdyb, and it is therefore arguable that Zdyb has a better view of Hough than did Margulies. Zdyb's testimony is more helpful to Margulies than is Margulies's own testimony. Nonetheless, Margulies maintained that Hough fell.

Only after seeing Hough jump to his feet and throw his flag, and believing Hough to be unhurt, Margulies proceeded north on Sixth Avenue. (T219,220). While the light was favorable to him, Margulies crossed 23rd Street and proceeded.to the meeting with Cuomo at the offices of Weil Gotshal. (T220-221).

The accident took place within a very compressed period of time – "in fractions of seconds," according to Margulies (T238), and "in a blink of an eyelash," according to Hough. (T107).[4]

On August 15, Margulies was contacted by a New York City Police detective, and given a Desk Appearance Ticket, charging him with violating New York State Penal Law §120.20 ("Reckless endangerment in the second degree"). (T222). Within the following several days, Margulies was told that the Manhattan District Attorney's Office had declined to prosecute him. (T222-223).

---

[4] It should be noted that Hough's account of the accident is substantially different from Margulies's and Zdyb's. Hough testified that Margulies's car was being driven at a fast rate of speed, "I never saw the car coming at me I would've screamed. I just – I stepped back, bang." (T52). He testified that the force of the collision threw him onto the hood of Margulies's car, and that Margulies continued to drive while Hough hung on for dear life, "I was on the hood of the car…my concern was falling off that car and getting run over." (T53). He testified that Margulies drove like a madman, "He turned to the left, and turned to the right, then slammed on the brakes, I came off the car." (T54). But he also testified that he returned immediately to the job site (T57) and did not leave – to seek medical care, or for any, other reason, until his shift ended at 3:30 pm, more than four hours after the accident. (T59).

When asked whether he went to the emergency room of a hospital that day, Hough admitted that he did not go to a hospital until August 19, more than two weeks after the accident. (T286).

Furthermore, Hough conceded that he continued to go to work every day for the two weeks following the accident. (T294).

And when asked about his claim for benefits under Worker's Compensation, Hough admitted that, "Yes, the independent medical examiner referred to me as a malingerer."

Significantly, the Court concluded in its Written Decision that, "I do not credit Hough's version which implies far greater immediate injuries than the facts suggest." (Written Decision, p. 5).

Approximately two and a half years later, Margulies learned that the District Attorney's office had reopened the investigation of that day's events. (T225). Margulies hired an attorney, who arranged for Margulies to meet with representatives of the Manhattan District Attorney's Office. (T225). Margulies agreed to plead guilty to violating New York State Penal Law §120.00(02) ("Assault in the third degree") defined as "recklessly causing physical injury to another person." (Plaintiff's Trial Exhibit 3) (T226). He was sentenced to a Conditional Discharge, and order to pay a fine of $1,000. (Plaintiff's Trial Exhibit 3)

Margulies self-reported to the Disciplinary Committees of New York and New Jersey, the two states in which Margulies was licensed to practice law. (T227-228).

In March 2005, Margulies's infant son Benjamin was diagnosed with Tay - Sachs disease, a genetic disease with a mortality rate of 100%. Shortly thereafter, Margulies and his wife Elizabeth discovered that, in the ICU of the Children's Hospital of Duke University Children's Medical Center (hereinafter, "Duke"), a team of oncologists and hematologists were conducting an experimental medical trial in which children with diseases similar to Benjy's were being given transplants of umbilical cord blood. Margulies, his wife and Benjy immediately relocated to Durham, North Carolina, where they enrolled Benjy in the transplant trial. (Affidavit of Joshua Simon Margulies in Opposition to Application of Dennis

11

Hough's For An Order Directing an Examination and Production of Documents Pursuant to Bankruptcy Rule 2004 ("Margulies 2004 Affidavit") BK Dkt. No. 31, paragraph 14).

In October 15, 2005, while the Margulieses were living in North Carolina, they learned that Hough had filed suit ("the State Court Action"), accusing Margulies of having acted negligently in connection with the August 3, 2000 accident. (Defendant Margulies's Trial Exhibit R; Complaint in the underlying action).

Hough had been granted a default judgment in the amount of $3,300,000, plus interest costs and disbursements. (Plaintiff's Trial Exhibit 4).

Margulies contacted Richard Maltz, a New York City attorney, to contest the judgment, and, in a Motion made in January of 2006, Margulies asked that the default judgment be set aside, or, at least, that the judge hold a Traverse Hearing, to determine whether Margulies had ever been served properly. (Margulies 2004 Affidavit, paragraphs 18 and 19).

On July 4, 2006, the Margulieses moved back to New York. (Margulies 2004 Affidavit, paragraph 20).

On November 27, 2006 Benjamin died. (Margulies 2004 Affidavit, paragraph 22).

On December 29, 2006, New York State Supreme Court Justice Tingling denied Marguies's Motion to Vacate Default Judgment. This was only a few weeks after Benjamin died, and Margulies was suffering from major depression, and post-traumatic stress disorder. He was not in a position to make rational decisions – and by the time he was able to refocus his attention on the "normal" activities of day-to-day life, the time in which he might have appealed Justice Tingling's Decision had expired. (Margulies 2004 Affidavit, paragraph 28). The default judgment was unassailable.

On July 26, 2010, Margulies filed his Chapter 7 Voluntary Petition ("Petition"). (BK Dkt. No. 1).

On October 25, 2010, Hough brought an Adversary Proceeding against Margulies and USAA Casualty Insurance Company ("USAA"). (Complaint Objecting To Dischargeability Pursuant to 11 U.S.C. § 523(a)(6), for Judgment Pursuant to Section 3420 of the New York State Insurance Law, and for Declaratory Relief Pursuant to 11. U.S.C. § 105(a) ("AP Complaint") (AP Dkt. No. 1).

At the time of the August 3, 2000 accident, Margulies was the named insured under a $300,000 automobile liability policy (the "Auto Policy') and a $1,000,000 Personal Umbrella Policy (the "Umbrella Policy") (together the "Policies"), both

issued in New York by USAA. (Plaintiff's Trial Exhibits 5 and 6; Answer of USAA to Complaint ¶5, 6).

Hough theorized that he should be allowed to recover against either Margulies or USAA. Unless Margulies's actions on August 3, 2000 were determined to be "intentional," Hough, standing in Margulies's shoes, would be permitted to recover under the policies. (AP Dkt. No. 1, paragraph 38).

And if Margulies's August 3, 2000 behavior were found to be "willful and malicious," the judgment debt to Hough would not be dischargeable under Bankruptcy Law – and Hough would be allowed to proceed to collect against Margulies. (AP Dkt No. 1, paragraph 37).

Hough argued that "willful and malicious" under 11 U.S.C. § 523(a)(6) was interchangeable with "intentional acts" under New York State law regarding insurance exclusions, and the Bankruptcy Court was persuaded (*Hough v. Margulies (In re Margulies)*, 476 B.R. 393 (Bankr. S.D.N.Y. 2012) ("Margulies I")). On December 14, 2013, a hearing was held.

On May 16, 2013, the Bankruptcy Court issued its Written Decision, in which it found Margulies to be more credible than Hough, regarding the events surrounding the August 3, 2000 accident. ("Written Decision.) Nonetheless, the Bankruptcy Court also found Margulies's actions during the August 3, 2000

accident to have been "willful and malicious." Accordingly, Margulies's debt to Hough would not be dischargeable in bankruptcy, and USAA would not be required to indemnify Margulies. (Written Decision.")

On June 11, 2013, Margulies filed a Notice of Appeal (AP Dkt. No. 119).

On June 13, 2013, Hough filed a Cross Notice of Appeal (AP Dkt. No. 121).

On July 2, 2013, Margulies filed a Designation of Record on Appeal and Statement of Issues (AP Dkt. No. 126).

On July 15, 2013, Hough filed a Counter Designation (AP Dkt. No. 127) and Statement of Issues Presented on Cross Appeal (AP Dkt. No. 128).

On July 25, 2013, USAA filed Defendant USAA Casualty's Counter-Designation Of Additional Items To Be Included In The Record On Appeal. (AP Dkt. No. 138).

On August 27, 2013, the appeal was docketed in District Court. (Civil Cover Sheet from U.S. District Court, Case Number: 1306009 Judge Katherine Polk Failla, filed by the Clerk's Office of the U.S. Bankruptcy Court, S.D.N.Y.) (AP Dkt. No. 142).

## STANDARD OF REVIEW

The lower court's conclusions of law are reviewed de novo. Margulies submits that substantially all of the issues relevant to this appeal are legal issues.

## ARGUMENT

## OVERVIEW OF NON-DISCHARGEABILITY CLAIM

In determining whether Margulies's debt to Hough is dischargeable, the Court has two, separate issues to consider: (1) whether Margulies's action was "willful," and (2)  whether it was "malicious." The Supreme Court has ruled that it is the *injury*, and not the *conduct*, which must have been "willful." There is no evidence whatsoever that Margulies wanted to hurt Hough; in fact, even Hough testified that he did not believe Margulies wanted to hurt him. (T119). Therefore, Margulies's actions cannot be deemed to have been "willful." Further, when the parties did not know each other prior to the incident which is the subject of the dischargeability issue, "malice" cannot be found to exist unless there are "aggravating circumstance[s] evidencing conduct so reprehensible as to warrant denial of the 'fresh start' to which the…debtor would normally be entitled." <u>Bundy American Corporation v. Blankfort</u> <u>(In re Blankfort)</u>, 217 B.R. 138, 144 (Bankr. S.D.N.Y. 1998). The evidence presented to the Court through testimony and

exhibits clearly demonstrates that Margulies's actions did not rise above the level of ordinary negligence, and, therefore, cannot be deemed to have been malicious. Accordingly, the debt must be discharged.

## APPLICABLE LAW

Section 523(a)(6) of title 11 of the United States Code (the "Bankruptcy Code") provides for an exception to dischargeability of an obligation "for willful and malicious injury by the debtor to another entity or to the property of another entity."

In order to effectuate the "fresh start" policy of the Bankruptcy Code, exceptions to discharge are strictly construed against the creditor and liberally in favor of the debtor. In re Morris, 223 F.3d 548, 552 (7th Cir. 2000).

The burden is on the person claiming non-dischargeability of a debt, with the appropriate standard of proof being a "preponderance of the evidence." Grogan v. Garner, 498 U.S. 279 (1991).

The terms "willful" and "malicious" contained in section 523(a)(6) are separate elements that must both be satisfied. Neshewat v. Salem (In Re: Salem), 290 B.R. 497, 485 (S.D.N.Y. 2003)(citations omitted).

**The Bankruptcy Court erred in finding that Margulies's conduct was "willful" within the meaning of Bankruptcy Code § 523(a)(6).**

## DETERMINING "WILLFULNESS"

**Unifying divergent views among Circuit Courts**

Until 1998, the interpretation of the word "willful" in the phrase "willful and malicious" was a subject of substantial litigation, and was interpreted differently by varying Circuit Courts. For example, the Court of Appeals for the Tenth Circuit found nondischargeable a debt owed by a doctor whose "care and actions" had been "so reckless and willful that both compensatory and punitive damages were [awarded]." Specific examples of the doctor's actions cited by the bankruptcy court included "the prescribing of an anesthetic without a patient history, the over induction of the patient with anesthesia, and the cover up of records relating to the surgery and subsequent cardiac arrest. In re Franklin, 726 F.2d 606, 610 (10th Cir. 1984).

Similarly, the Court of Appeals for the Sixth Circuit found nondischargeable a debt owed by a doctor whose conduct "both the Bankruptcy and District Judges correctly characterized as being absolutely appalling. The proof showed that [the judgment debtor] unnecessarily injected [the judgment creditor's] left foot with an

unsterile needle or contaminated medication. Thereafter, he failed to perform timely tests when resultant infection was apparent. [He] then ignored the results of belated tests that identified the offending bacteria…Finally, [he] failed to hospitalize [the judgment creditor] when hospitalization was urgently needed. Perkins v L Scharffe, 817 F.2d 392, 393 (6th Cir. 1987).

By contrast, the Court of Appeals for the Eighth Circuit reversed a lower court's finding of a medical malpractice debt to be nondischargeable, despite the fact that the judgment debtor admitted to having prescribed for the judgment creditor a less-than-effective antibiotic because the effective one was more expensive; canceled another doctor's order to transfer the judgment creditor to an infectious disease specialist; and, believing erroneously that the infection had run its course, discontinued all antibiotics – resulting, a few days later, in the amputation of her leg. In fact, the Court of Appeals found the debtor's actions to have fallen short of the threshold for "willful and malicious" conduct, notwithstanding the Bankruptcy Court's ruling that said "conduct included egregious behavior, utter incompetence, or a total disregard for medical standards." In re Geiger, 93 F.3d 443, 444 (8th Cir.1996).

In 1997, the United States Supreme Court "granted certiorari [specifically] to resolve this conflict [between the lower threshold needed to reach a finding of

"willful and malicious" conduct in the Sixth and Tenth Circuits, and the more stringent requirements needed to prove willful and malicious conduct in the Eighth Circuit]. <u>Kawaauhau v Geiger</u>, 521 U.S. 1153 (1997).

**Supreme Court Mandates Use of the More Stringent Standard**

The United States Supreme Court has held that "[t]he word 'willful'…modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to 'injury.'" (Emphasis in the original.) <u>Kawaauhau v Geiger</u>, 523 U.S. 57,61 (1998).

The unanimous decision concludes, "We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of §523(a)(6)." <u>Kawaauhau v. Geiger</u>, 523 U.S. at 64 (1998).

**The Bankruptcy Court erred in finding that Margulies's conduct was "willful" within the meaning of Bankruptcy Code § 523(a)(6), because the Bankruptcy Court had not determined as a matter of fact that Margulies had intended to hurt Hough.**

Notably, the <u>Kawaauhau</u> Court considered a situation like the one before this Court: "[A] more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended…*Every traffic accident stemming from an initial intentional act…could*

20

*fit the description*…A construction so broad would be incompatible with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed.'" (Italics added.) <u>Kawaauhau v. Geiger</u>, Id. citing <u>Gleason v. Thaw</u>, 236 U.S. 558, 562 (1915).

The <u>Kawaauhau</u> decision makes clear the unacceptability of holding nondischargeable every debt arising from "[e]very traffic accident stemming from an initial intentional act," and, in fact, that description is the one which best fits the factual scenario in the instant case: Margulies's disregard of Hough's direction to keep his car in place may be found to be "an initial intentional act," and the debt arose from the accident which followed that initial intentional act – but, absent any evidence that Margulies intended to cause an injury at the end of the ensuing chain of events, his conduct during the traffic accident cannot be found to have been willful.

To prevail in proving that Margulies's actions were "willful," Hough must establish both that Margulies intended to have the Car make contact with Hough *and* that Margulies intended to cause Hough injury – but the record, in fact, demonstrates the opposite: at no time did Margulies intend to have the Car make contact with Hough; and at no time did Margulies intend to cause Hough any harm or injury. (T139, 221, 231).

The testimony of Kris Zdyb, the only other passenger in the car, and also the only other eyewitness to testify at trial, is consistent with Margulies's testimony that Margulies alerted Hough that he wanted to proceed forward, and that when the Car "touched" Hough it was moving so slowly that it was "not even accurate to characterize this as somebody being struck in my opinion." (T172).

All of the testimony adduced at trial was consistent in that the accident occurred within a period of approximately five (5) seconds and that Margulies and Hough had never met each other before the accident. Putting aside the absence of any evidence that Margulies wanted to hurt Hough, it is difficult to imagine how Margulies, or anyone else in his position, could have formulated and acted upon the requisite intent to harm Hough during the span of a few seconds – that is, accelerating from only 5 or 10 feet away, from an initial position of a full stop.

The Bankruptcy Court did not conclude that Margulies wanted to hurt Hough and, without having wanted to hurt Hough, Margulies could not have been found to have acted "willfully."

**The Bankruptcy Court erred in finding that Margulies's conduct was "willful" within the meaning of Bankruptcy Code § 523(a)(6), because the Bankruptcy Court had not determined as a matter of fact that Margulies had believed that his actions were "substantially certain" to cause injury to Hough.**

In an examination subsequent to the <u>Kawaauhau v Geiger</u> decision, the Sixth Circuit held that, for a debt to be held nondischargeable, either "the debtor desire[d] to cause consequences of his act, or believe[d] that the consequences are substantially certain to result from it. <u>Markowitz v. Campbell</u> (<u>In re Markowitz</u>), 190 F.3d 455 (6th Cir. 1999). In Margulies's case, it is clear that he did not "desire" to cause injury to Hough; moreover, he could not be thought to have been "substantially certain" that the injury occurred – because he was moving the car slowly, and because he believed that the car would not make contact with Hough – both of which have been accepted by all parties. (See Hough FOF, *supra* and USAA FOF, *supra*.)

In fact, the Bankruptcy Court characterized the interaction between Hough and Margulies to resemble "a game of chicken." But, in that "game," either party will turn away when he believes injury would otherwise be likely. Logic holds that a participant would persist in his conduct, and would choose to *not* turn away, only if that participant were sure that the *other* party would "blink" first.

The "substantial certainty" test does not require that the debtor's actions be laudable; the question of whether Margulies "should" or "should not" have engaged in what the Bankruptcy Court described as the "game of chicken." The test asks

only whether the debtor believed – to a substantial certainty – that the creditor would be hurt.

Logic suggests that a person would act to remove himself from the path of an advancing car. Whether the car should have been advancing in the first place is immaterial. Margulies's car was advancing, and Margulies assumed, logically, that Hough would remove himself from the car's path.

Not only was Margulies not "substantially certain" that Hough would be injured, but, in fact, under the circumstances, was rightfully "substantially certain" that no contact would occur.

Hough concedes this very point. In paragraphs 75-81 of his Proposed Findings of Fact, Hough asked the Court to accept as fact a scenario which precludes any conclusion that Margulies wanted to harm Hough (a necessary component to finding that Margulies's conduct was "willful").  According to Hough:

> [t]he evidence suggest that Margulies' assumed, no doubt recklessly so, that Hough <u>knew</u> Margulies' intended to proceed forward when the light changed, and assumed that Hough was <u>aware</u>  that Margulies had started forward after the light at the intersection of 23rd Street changed; Margulies proceeded thinking that Hough would know not step back into the path of his moving car, and would know not to continue in the path as Margulies steered to the left. Any person knowing and perceiving what Margulies mistakenly believed Hough then presently knew and perceived would easily avoid being struck by his car as he continued forward. These mistaken thoughts by Margulies about what was in the mind and perception of Hough led to

the occurrence of the accident. (Hough FOF ¶79) (emphasis in original).

The Bankruptcy Court did not conclude that Margulies was :substantially certain" that a collision would occur, and, considering the slow pace at which Margulies's car was rolling forward, the belief that an *injury* would be substantially certain to occur would be even more unlikely. Accordingly, the Bankrupty Court erred in finding that Margulies had acted "willfully."

**The Bankruptcy Court erred in finding that Margulies's conduct was "willful" within the meaning of Bankruptcy Code § 523(a)(6), because Hough himself contended that Margulies's conduct was not willful.**

Hough acknowledges that "the evidence demonstrates that the District Attorney's charge got it exactly right – Margulies acted recklessly and criminally in causing Hough's injuries, but this was not an altercation." (Hough's Proposed Findings of Fact ¶80).

Hough's Proposed Findings of Fact also asserts that "[t]here is insufficient evidence to sustain USAA's burden of proving, by a preponderance of the evidence that the loss results solely from intentional harm." (Hough's Proposed Findings of Fact ¶80). This admission is a further illustration of the paucity of evidence in the record to sustain Hough's burden under section 523(a)(6) of proving that Margulies

deliberately intended to injure Hough, and that Margulies acted wrongfully and "without just cause or excuse, even in the absence of personal hatred, spite or ill will." <u>See</u> <u>eg.</u>, <u>Hough v. Margulies</u> <u>(In Re: Margulies)</u> 476 B.R. at 400.

The major factual difference in the trial testimony of Hough and Margulies/Zdyb is that Hough contends that after the Car made contact with Hough, "Margulies jerked the steering wheel to the left and the right 'trying to knock me [Hough] off' then slammed on the brakes…." (Hough's Proposed Findings of Fact ¶71). Both Margulies and Zdyb deny that this ever happened. This is not a small distinction; the two versions are entirely incompatible.

And in fact, the Bankruptcy Court's decision states explicitly that it does not credit Hough's account of the events as truthful.

**The Bankruptcy Court erred in finding that Margulies's conduct was "willful" within the meaning of Bankruptcy Code § 523(a)(6), because Hough presented no proof of injury consistent with Hough's version of the events attendant to the accident.**

The medical records which were accepted into evidence lend further support to Margulies and Zdyb's version of the facts. For example, there is no mention of trauma to Hough's hands, no mention of the 'road rash' which occurs when a person slides on pavement after being dislodged from a vehicle, and no mention of any

26

trauma to the face, head, shoulders or neck. The absence of the presentation of more serious physical injury undercuts Mr. Hough's testimony that he was struck by a car, carried on its hood for a half of a block, swung back and forth while gripping tightly with his fingers, and ultimately thrown onto the pavement.

In his Proposed Findings of Fact Hough admits that:

Hough's testimony is insufficient to satisfy USAA's burden of proof that its insured Margulies acted with a subjective intent or certainty to cause injury to Hough. Hough's reported opinion as to what was in the mind of Margulies, i.e., that he was trying to knock him off the hood, by its nature is speculation by Hough as to the mental state and subjective intent of someone else, properly of little probative value. (Hough's Proposed Findings of Fact ¶71).

Hough's own Proposed Findings of Fact continue by acknowledging that:

[s]uch action by the driver Margulies is at least equally consistent with an intention to avoid hitting and to stop when contact was made, the action/reaction testified to by Margulies (that he steered his vehicle to the left/west to avoid contact with Hough, that he then turned the wheel back to the right (straightening) to avoid vehicles to his left and that he braked hard when his car was making contact with Hough). (Hough's Proposed Findings of Fact ¶73). It is at least as likely from the circumstances an [sic] and testimony that the described turning of the steering wheel and acceleration, and turning back of the steering wheel and braking reflect an intention of the driver to avoid contact and injury to the pedestrian. (Hough's Proposed Findings of Fact ¶74).

## HOUGH HAS FAILED TO MEET HIS BURDEN OF PROOF ON THE WILLFULLNES ELEMENT OF SECTION 523(A)(6)

The record in this case and Hough's own admissions as set forth in paragraphs 32-33, <u>supra</u>, demonstrate that Hough failed to meet his burden of proving that Margulies deliberately intended to injure Hough. See, <u>In Re: Margulies</u> 476 B.R. at 393.

## DETERMINING "MALICIOUSNESS"

**The Bankruptcy Court erred in finding that Margulies's conduct was "malicious" within the meaning of Bankruptcy Code § 523(a)(6).**

### Malice "in fact"

Nether the testimony of Margulies, Zdyb or Hough portrays Margulies' conduct as being anywhere near that which is required to prove malice under section 523(a)(6) and the relevant case law.  Rather, the record shows that the events were the result of an unforeseen accident, not malicious conduct.  Right up until the moment when the Car made contact with Hough, Margulies was taking every possible step to make sure that the Car proceeded without touching Hough. <u>See</u>, Findings ¶¶20-33.  Moreover, Hough's own admissions, described in

paragraphs 32-33, <u>supra</u>, further support the lack of evidence of malice in the record.

**The Bankruptcy Court erred in finding that Margulies's conduct was "malicious" within the meaning of Bankruptcy Code § 523(a)(6) because the Court found no evidence of personal animus such as that which exists in a dispute between parties who know each other and whose relationship includes a personal animus.**

### "Imputed" Malice

Imputed malice may be found where the debtor's conduct has "no potential for economic gain or other benefit to the debtor, from which one could only conclude that the debtor's motivation must have been to inflict harm upon the creditor." <u>Am. Honda Fin. Corp. v. Ippolito (In re Ippolito)</u>, 2013 Bankr. LEXIS 866 (Bankr. E.D.N.Y March 6, 2013 (citing <u>In re Luppino,</u> 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998)).

However, where a debtor's conduct has potential for economic gain or benefit, "the underlying conduct, however deplorable, would not give rise to liability under §523(a)(6) in the absence of some additional, aggravating conduct on the part of the

debtor of sufficient gravity to warrant an inference of actual malice." <u>Navistar Financial Corp. v. Stelluti (In re Stelluti)</u>, 94 F.3d 84 (2d Cir. 1996).

And, in Margulies's case, (and both Hough and USAA have conceded this fact, See Hough FOF 45 and USAA FOF 28) he had a "potential for economic gain or benefit" – and a significant one, at that. Margulies and his business partner were traveling to a meeting with Mario Cuomo, to discuss Governor Cuomo's investing in and/or serving on the board of their startup. It is undisputed that Margulies's lateness for this important meeting was the catalyst for the chain of events leading to the accident with Hough.

The burden for establishing imputed malice under section 523(a)(6) of the Bankruptcy Code is heavy:

> In the absence of a finding of "Biblical malice," an ordinary tort or breach of contractual or statutory duty generally is not sufficient to deny discharge under subsection (6) without some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the "fresh start" to which the…debtor would normally be entitled under the Bankruptcy Code. <u>(In re Blankfort)</u>, 217 B.R. at 144.

In fact, the level of egregious conduct that a plaintiff must show in order to successfully prosecute a proceeding to except a debt from discharge under section 523(a)(6) is illustrated in Guthrie v. Williamson (In re Kokenge), 279 B.R. 541 (Bankr. E.D. Tenn.2002), in which summary judgment was granted to a defendant accused of injuring the plaintiffs in a crash occurring as a result of alleged drag-

racing on a "winding mountain road ('with snow on the ground') at speeds in excess of ninety miles per hour." Id. at 543-44

In another case centering on a traffic accident, (discussed by Margulies in his Pre Trial Memorandum of Law, dated December 7, 2012 (Docket #66)[5], in <u>Tso v. Nevarez (In re Nevarez)</u>, 415 B.R. 540, 543 (Bankr. D.N.M. 2009)), where the debtor was driving at an estimated pre-impact speed of 47 mph on a road with a 35 mph speed limit, and drove through a red light, the Court granted defendant/debtor's motion for summary judgment dismissing a section 523(a)(6) complaint because (i) the plaintiff presented no evidence that the debtor knew that harm to plaintiff was substantially certain to occur, and (2) a finding of non-dischargeability based on an inference that the debtor knew or should have known that his reckless driving would result in injury would inappropriately expand the scope of non-dischargeability under section 523(a)(6) to include acts of negligence under an objective, reasonable person standard. <u>Id</u>. at 546.

**The Bankruptcy Court erred in finding that Margulies's conduct was "malicious" within the meaning of Bankruptcy Code § 523(a)(6) because the Court did not consider the rationale behind Margulies's actions.**

---

[5] The Debtor's Pretrial Memorandum of Law is incorporated by reference herein.

Logic suggests that similar acts may be undertaken with dissimilar motives. Consider Debtors Smith and Jones: Smith spraypainted a neighbor's car because he thought the neighbor had been stealing Smith's newspaper; Jones spraypainted "Jones loves Rhonda" on the side of a building in order to proclaim his love for all to see.

Both debtors spraypainted property owned by others. The actions of neither are praiseworthy. But their rationales are decidedly different: Smith directed his actions at his victim; Jones did not consider his victim's potential injury, and acted without thinking of the victim.

Margulies did not allow his car to roll forward in order to "teach a lesson" to Hough, nor to send a message to the world of flagmen that they should be cognizant of the needs of drivers. Rather he allowed his car to roll forward because he needed to get to his meeting; Hough's injury was incidental. Accordingly, Margulies acted without malice.

**The Bankruptcy Court erred in finding that Margulies's conduct was "malicious" within the meaning of Bankruptcy Code § 523(a)(6) because**

**the Bankruptcy Court attributed "malice" to Margulies's actions when it found that his actions were "without just cause or excuse."**

If malice were to be found whenever a person acted "without just cause or excuse," and if willfulness were to exist only when the actor intends to cause an injury, then, by definition, the only way to reach "willfulness" without also reaching "malice" would be in a scenario in which there were "just cause or excuse" for wanting to hurt someone.

**The Bankruptcy Court erred in finding that Margulies's conduct was "malicious" within the meaning of Bankruptcy Code § 523(a)(6) because the Bankruptcy Court's legal construction of "malice" makes moot the "malice" element in the "willful and malicious" test.**

Logic requires that, for "willful" and "malicious" to be truly independent of each other (as the Supreme Court's decision in Kawaahuau demand that they be), four possibilities must exist: (1) actions which are both willful and malicious; (2) actions which are neither willful nor malicious; (3) actions which are willful but not malicious, and (4) actions which are malicious, but not willful.

Examples of (1) and (2) abound. And an example of (3) would occur, maybe, when the debtor wants to scare – but only scare – the creditor by, say, holding him out a window and letting him think he might get dropped…but then actually, accidentally drops him; in that scenario, the malice was there from the beginning, but the injury was not willful. But examples of (4) do not come easily to mind; it may not be possible to describe injuries which are malicious, but not willful – and, if such actions cannot be found to exist then the word "malicious" is subsumed by the word "willful," which is in perfect contravention of the holding in Kawaahau.

**The Bankruptcy Court erred in finding Margulies's debt to Hough is excepted from discharge under Bankruptcy Code § 523(a)(6), because not even judgments arising from unlawful acts are all inherently found to be nondischargeable.**

Paragraphs 16 and 17 of Hough's Post Trial Memorandum of Law/Proposed Conclusions of Law, which is wholly inconsistent with Hough's admissions, appear to argue that if a debtor disobeys a traffic law, such act satisfies the malice element of section 523(a)(6). However, Hough provides no case law to support his proposition – because none exists; in fact, the United States Supreme Court has

said the opposite: not every traffic accident arising from an initial intentional act may automatically be found to have been the result of "willful and malicious" conduct. <u>Kawaauhau v Geiger</u>, 521 U.S. 1153 (1997).

In fact, the cases cited above, in paragraphs 40 and 41, involve breaches of the law – and, yet, the debts were held to be dischargeable.

Finally, it should be noted that, while USAA likens Margulies's actions to that of a person who carries a "loaded gun" (USAA FOF, p. 2), even *that* conduct (and even when coupled with the subsequent firing of the gun!) is not necessarily grounds for a finding that a debt is nondischargeable. See <u>Corley v Delaney</u> (<u>In Re Delaney</u>), 97 F.3d 800 (5th Cir. 1996) (also discussed by Margulies in his Pre-Trial Memorandum of Law), where the Court held that a debt was dischargeable even when it arose from an injury cause by a gunshot after the debtor (a) expected conflict and nonetheless (b) brought a loaded gun to the scene of the expected conflict.


## **CONCLUSION**

For all of the reasons set forth herein and based upon the record before the Court, this Court should enter an order reversing the decision of the Bankruptcy Court, and determining that the obligation of Margulies to Hough is discharged.

Dated:      Lynbrook, New York
            September 30, 2013        /S/ Joshua Simon Margulies
                                           Joshua Simon Margulies
                                           88 Walnut Street
                                         Lynbrook, New York 11563
                                         Telephone: (917) 509-6240
                                         Facsimile: (212) 202-6136

                                         *Pro Se Appellant*